**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.** **Case No. 6:25-cr-289-PGB-DCI**

**KARRIEM AZIZ GLASTER,**

**Defendant.**
**_______________________________________/**

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**

Defendant, Karriem Aziz Glaster, through undersigned counsel, submits this Sentencing Memorandum in advance of his sentencing on September 29, 2026, at 2:30 pm. For the reasons stated herein, including his military service and his history of PTSD and autism, Mr. Glaster requests that this Court vary downward from the advisory guideline range of 121-151 months (PSR ¶ 66) to the minimum mandatory sentence of five years imprisonment with a recommendation that Mr. Glaster participate in the Resolve Program for Victims of Trauma.

Mr. Glaster was raised "in a hostile environment because his parents argued frequently. The defendant's father was harsh and punished the defendant for no reason. There were occasions in which he spanked the

defendant. Glaster stated that he suffered a speech impediment, and his parents treated him like he was 'dumb.'" PSR ¶ 43. Mr. Glaster was also bullied at school due to his appearance. PSR ¶ 54. Mr. Glaster engaged in physical altercations when he defended himself that resulted in suspensions. PSR ¶ 54. As detailed more fully below, Mr. Glaster endured significant trauma throughout his childhood.

Despite his difficult upbringing, in November of 1994, Mr. Glaster chose to join the United States Army to serve his country. PSR ¶ 61. Mr. Glaster "was honorably discharged as a specialist on January 2, 1997, after completion of required active service. Glaster received the following: national defense service medal, army lapel button, army service ribbon, sharpshooter marksmanship qualification badge with grenade bar, and marksman marksmanship qualification badge with rifle bar." PSR ¶ 61. Tragically, during his time in the Army, he witnessed the suicide of a fellow officer. *See*, *infra*. As a result of a lifetime of trauma, "in 2025, he was approved disability due to post-traumatic stress disorder and received $4,400 monthly in benefits." PSR ¶ 61.

A. Mr. Glaster's Personal Characteristics

1. Mr. Glaster's History of Trauma

On March 21, 2026, Mr. Glaster was evaluated by Sudhanva Rajagopal, Psy. D. *See* Rajagopal Report attached to PSR. Dr. Rajagopal also reviewed

Mr. Glaster's military, educational, and mental health records. Rajagopal Report at 2. Dr. Rajagopal wrote that "Mr. Glaster reported experiencing several traumatic events starting in childhood, including witnessing community violence, witnessing domestic violence, verbal and physical abuse by his parents, exposure to coercive and illicit sexual behavior by his stepbrother, unwanted sexual contact, bullying, tragic losses and abandonment, and witnessing the suicide of a fellow soldier while in the military." Rajagopol Report at 7-8. On the ACE (Adverse Childhood Experiences) inventory, Mr. Glaster scored eight points out of ten, indicating significant trauma. *Id*. at 8.

Dr. Rajagopol diagnosed Mr. Glaster with Post-Traumatic Stress Disorder ("PTSD") with delayed expression. *Id*. at 7-8. One of the most significant traumatic events in Mr. Glaster's life occurred when he witnessed the suicide of a fellow soldier while he was in the military: "I see him running past me. Out of corner of my eye I see him fall down. I hear the gunshot. I don't remember a whole lot after that." *Id*. at 4. Mr. Glaster experienced a flashback to this tragedy when he saw a man faint at the doctor's office. *Id*. at 5.

Dr. Rajagopol's report details how his past trauma influenced Mr. Glaster's daily life. Mr. Glaster experiences frequent intrusive thoughts that can be triggered by ordinary, daily life occurrences. *Id*. at 5. Mr. Glaster

reported that "he has experienced symptoms such as depression, bed-wetting, and nightmares since childhood but that seeing a man faint in a doctor's office in 2020, triggered memories of seeing a fellow soldier die by suicide. He reported that symptoms have been significantly worse since that time." *Id*. at 6. The time during which Mr. Glaster's PTSD worsened coincides with the time preceding the offenses at issue.

2. Mr. Glaster's History of Autism

Dr. Rajagopol reviewed Mr. Glaster's educational, military and mental health records and noted that Mr. Glaster's "VA medical records contain a diagnosis of ASD" and that his "[a]cademic records show early academic problems consistent with a neurodevelopmental disorder." *Id*. at 8. Mr. Glaster's behavior during the evaluation was also consistent with autism. He exhibited "poor eye contact, simplistic and sometimes childlike responses, [he] referenc[ed] not understanding social cues, his repetitive movements like rocking back and forth, and his apparent self-soothing behavior (fidgeting with a Rubik's Cube) are all consistent with ASD." *Id*. at 8.

3. As a Result of PTSD and Autism, Mr. Glaster Suffers from Significant Emotional and Cognitive Impairments

Dr. Rajagopol concluded: "Mr. Glaster suffers from significant emotional and cognitive impairment stemming from PTSD and autism. These two disorders each significantly impair Mr. Glaster's daily functioning. But

symptoms of PTSD and autism also interact with one another in potentially damaging ways. For example, hypersensitivity associated with autism can amplify hypervigilance associated with PTSD. Both disorders can result in significant issues with emotion regulation and impulse control. Finally, impairments in social and relational functioning are also common to PTSD and autism." *Id*. at 8.

4. Autism and Criminal Intent

Some features of autism are directly related to criminal intent. "Some of the specific socio-emotional impairments associated with autism include difficulty interpreting nonverbal cues, *poor impulse control, obsessiveness with pursuing specific interests, trouble understanding the viewpoint of others*, lacking awareness of others' personal space, and failing to recognize the implications of one's behavior. Individuals with autism may also have a limited understanding of social norms related to sexual interactions, which can result in *sexually inappropriate behavior without ill intent* or appreciation for the implications of their behavior." *Autism, Culpability, and Sentencing Decisions*, 49 Law & Psychol. Rev. 145 at 156-57 (2024-2025) (attached hereto as Appendix E) (emphasis added).

Mr. Glaster's autism is mitigating because it goes directly to impaired impulse control, obsessiveness with pursuing specific interests and trouble understanding the viewpoint of other. While he is certainly responsible for his

offenses, his autism significantly impaired his ability to control himself when he went down the rabbit hole of child pornography.

B. Argument

1. Data Shows that the Current Guidelines Result in Multiple Enhancements Applying to Most Offenders

Data collected by the Sentencing Commission shows that nearly all offenders sentenced pursuant to U.S.S.G. §2G2.2 have very high advisory guideline ranges, thus demonstrating that the advisory guidelines do not separate the least offenders from the worst offenders. "Several provisions in the current sentencing guidelines for non-production offenses…originally were promulgated in an earlier technological era."[1] Most of the enhancements were created at a time when the bulk of offenses were committed without the use of technology. "As a result, enhancements that were intended to apply only to certain offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders."[2]

> Since 2004, four of the six enhancements, a total of 13 levels, now apply to the typical defendant in a child pornography case.[3] In Fiscal Year 2010, 96.1 percent of the offenders received an enhancement under §2G2.2(b)(2) for pre-pubescent minor, §2G2.2(b)(4) for sadistic or masochistic conduct applied in 74.2 percent, and use of a computer under

[1] United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, Chapter 12, 313.
[2] *Id.*
[3] United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, Chapter 12, 316.

> §2G2.2(6) applied in 96.9 percent of cases.[4] **Sentencing enhancements that were originally intended to provide additional punishment for aggravated conduct, now routinely apply to the vast majority of defendants.**[5]

The application of these enhancements in virtually every child pornography case cannot be indicative of individualized sentencing.

2. A Sentence of Five Years is Sufficient, but Not Greater than Necessary, to Meet the Goals of Sentencing

"[W]here sentencing discretion is granted, it generally has been agreed that the sentencing judge's "possession of the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant-*if not essential* -[to the] selection of an appropriate sentence." *Lockett v. Ohio*, 438 U.S. 586, 602–03 (1978) "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (internal citations and quotations omitted).

In upholding a downward variance from the advisory guidelines range, the United States Supreme Court stated that "[i]t has been uniform and

---

[4] *Id.*
[5] *Id.* (emphasis added).

constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (internal quotation and citation omitted). A District Court is not limited to either the facts accounted for by the United States Sentencing Guidelines, or the factors enumerated in 18 U.S.C. § 3553 in determining an appropriate sentence. *Id*. at 59 ("the Guidelines are only one of the factors to consider when imposing sentence").

Even if the Guidelines calculation appears to encompass factors presented in mitigation, "district courts must nevertheless demonstrate meaningful consideration of the mitigation evidence rather than summarily dismissing it as accounted for by the Guidelines." *United States v. Cora-Alicea*, 100 F.4th 478, 483 (3rd Cir. 2024). In *Cora-Alicea*, the Third Circuit reversed the District Court where the lower court failed to consider significant mitigation on the ground that it was already accounted for by the Guidelines calculation. 100 F.4th at 483. The evidence presented in support of a downward variance included "evidence regarding his cognitive deficits and depression, mitigating motive, traumatic childhood, family ties, and employment prospects." *Id*. at 482.

The Supreme Court explained, "[a] district judge must include the Guidelines range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. 18 U. S. C. §3553(a)." *United States v. Kimbrough*, 552 U.S. 85, 91 (2007).

3. The Resolve Program for Victims of Trauma

The Bureau of Prisons Resolve Program fulfills Dr. Rajagopol's recommendations for treatment. "The Resolve Program is a cognitive behavioral therapy program designed to address the trauma-related mental health needs of individuals. Specifically, the program seeks to decrease the incidence of trauma related psychological disorders and improve level of functioning. In addition, the program aims to increase the effectiveness of other treatments, such as drug treatment and healthcare. The program uses a standardized treatment protocol consisting of three components: 1) initial educational workshop (Trauma in Life/Traumatic Stress & Resilience); 2) a skills-based treatment group (Seeking Safety) and; 3) Dialectical Behavioral Therapy (DBT), Cognitive Processing Therapy (CPT), and/or a Skills Maintenance Group." *Federal Bureau of Prisons, First Step Act Approved Programs Guide* at 25.

4. The advisory guideline range in Mr. Glaster's case is "greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

The attached appendix filled with pictures, newspaper articles, letters from loved ones and Mr. Glaster's artwork shows that Mr. Glaster is a kind, loving, generous person who has significant family support. Mr. Glaster's art is both therapeutic and something he loves sharing with others. He is known for making figures of a loved one's favorite athlete as a gift for them. He served his country for several years and was honorably discharged having been awarded numerous medals.

The connection between Mr. Glaster's PTSD and autism and his ability to form criminal intent shows that he will be amenable to treatment and learn how to overcome the impulses that resulted in the charged offenses. Dr. Rajagopol's recommendations parallel the treatment offered in the Resolve Program. Dr. Rajagopol specifically recommended Dialectical Behavior Therapy to "focus on concrete emotion regulation skills, communication strategies, and addressing maladaptive behavior patterns that often result from trauma." Rajabopol Report at 8. As shown above, Dialectical Behavior Therapy is available in the Resolve Program.

This is a case where, for a multitude of reasons, the advisory guideline range yields a sentence that is significantly longer than a sentence necessary to meet the goals of 18 U.S.C. § 3553. A sentence of five years would allow Mr.

Glaster to get the treatment he needs so that he can return to society in a productive manner. Mr. Glaster is deeply remorseful and asks this Court to show mercy given the unique confluence of mitigating factors present here and sentence him to the minimum term of five years imprisonment.

Dated this 22nd day of September 2026.

Charles L. Pritchard, Jr.
Federal Defender, MDFL

*/s/Katherine Puzone*
Katherine Puzone, Esq.
Assistant Federal Defender
Florida Bar No. 94491
201 South Orange Avenue
Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: katherine_puzone@fd.org

**CERTIFICATE OF SERVICE**

I Hereby Certify that undersigned electronically filed the foregoing Sentencing Memorandum with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing to the following: Stephanie McNeff, Assistant United States Attorney, this the 22nd day of September 2026.

*/s/Katherine Puzone*
Attorney for Mr. Glaster