# United States vs. Karrien Aziz Glaster

6:25-cr-289-PGB-DCI



**Katherine Puzone**
Assistant Federal Defender
201 S Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

**V** **Case No. 6:25-cr-289-PGB-DCI**

**KARRIEM AZIZ GLASTER**
___________________________________/

**APPENDICES**

Mr. Glaster's letter to the court…………………..……..……………..…........A

**Character letters**
Gail Glaster (Mother)………………………………………………...……….B1
Willie Glaster (Father)………………..……………………………………….B2
Brenda Gibson (Aunt)……………………………………………………….B3
Harvey L. Mitchell Jr.(Family friend)……………………..……...…………..B4
Comisha Payne (Friend)……………………………………………………..B5
Zanika Mitchell (Cousin)……………………………………………………….B6

Photographs of Service and Character……………………………………….C

**Sacramento, CA Patch Article**………………………………………………..D
*Rancho Cordova Disabled Veteran receives much needed gift*

**Autism, Culpability and Sentencing Decisions**…………………………….E
Law & Psychology Review

**The Resolve Trauma Treatment Program**…………………………………….F
*A Retrospective Evaluation of the Effects of Program Participation on Behavioral Outcomes*

A

I would like to start with an apology; I know what I did was wrong, and I wish I hadn't done it. I dont like making excuses but I was in a pretty messed up place at the time.

I've been battling with depression, anxiety, PTSD and Autism Spectrum disorder. I tend to process thing in a 3 dimesional way, and get hooked on patterns. I realized this when it was addressed by my therapist.

I use a Rubiks Cube to help my mind relax when I communicate with people. It helps me keep my thoughts in order.

I was prescribed antidepressents, encouraged to reengage in my Hobbies and spend time with Family, any type of activities to help me relax.

Your Honor; I apologize for everything I'm not the type of person my crime suggest. I was in an awful mindset at the time, but thats no excuse.

As of a year ago this may I was granted 100% disability with the VA.

I believed I was doing the right thing by speaking to homeland without the presents of an attorney, but I cooperated because again I believed I was doing the right thing.

But now I face a delemma. If I am to spend more than two months in a prison, I lose my Veterans Benefits. Which means I lose my home, my car everything.

I would be placed in a situation to return back to work; where I would likely be blackballed as an electrician and getting back into security? (no chance).

I ask only one request; a second chance. To pick up where I left of back in October 25 let me spend Time with my family, and please allow me my Dream endeavor. To Hike The Pacific Crest trail. The Trail is a world famous Hiking Trail spanning The west coast of California, Oregon and washington. adventure of 2650 miles a remedy TO my midlife Crisis. You can personally Keep Tabs on me because I plan to document my journey. again I promise to always cooperate any way possible.

Pg 1 of 2

B1

Gail Glaster
[redacted]

To the Honorable Judge Byron

My name is Ms. Gail Glaster, I'm a retired civilian military police officer, and I'm the mother of Mr. Karriem Glaster and love my son very much. Due to my son's medical and mental issues, Autism being one of them, my son has suffered, both mentally and physically.

I knew Karriem was different when he was about 4 years old and living in Alaska. Although there were little boys that he also played with and they shared toys, he enjoyed most playing house with a little girl that lived across the street, her mother would send him home as soon as I return from work. As Karriem got older he appeared to be a happy child, however he didn't see or process issues as well as he should have however we all did our best working through the issues.

Please be advised the illness Autism didn't come up during Karriem's school years, nor was it brought to my attention by any of his teachers. It was many years later, perhaps living in different cities or different parts of the city. Karriem is basically a private person however he would call me every week, to check on me. I tend to do the same with all my children.
Karriem has always been a very creative child, and made most of his own toys, as an adult he still does. My son gets stressed very easy and he fidgets, causing him to need his Rubik Cubes when speaking to others, he carries three cubes wherever he goes. When going to court hearings he needed to have them as well.

Although my son has Autism, he wanted to go into the military like his father, I was so proud of him, he received and honorable discharge and medals. Due to Karriem being 100% disable and unable to continue as an electrician, like his mom he became a security officer. Karriem is a very caring person and does his best to be a responsible person. Karriem loves being an uncle, his nieces and nephews are his pride and joy. For the past 10 years, of marriage, and Karriem and his wife arrive, to our family gatherings, it's always Karriem that comes with food or several desert that he made himself.

I was shocked and devastated to learn that my son was charged, with a cyber crime, shocked even more because neither my son nor his wife said anything about the incident that happen on a ship for two long years, yet both were staying at their residence. I do think that Karriem's Autism affects his decision making, and his wife filing for divorce two years after the incident has not made things easy for Karriem or me. I have stood by my son through it all and grateful that the courts selected me to help monitor and keep him on schedule for hearings and medical appointments.

This incident will cost my son to lose his home, due to his VA benefits being suspended; I will continue to do what I can to help support him, however it will be very difficult. My son of course is not perfect;

however he's a very good person and we all miss him. Prior to the incident I don't know of my son being in any trouble. This incident has caused him some painful and spiraling issues.
I thank you Your Honor for reading my letter.

Ms Gail Glaster
Ms Gail Glaster

**B2**

**Willie Glaster** Sat, Jul 25, 8:00 PM (11 hours ago)

**To the Honorable Judge Byron:**

I'm the father of Karriem Glaster, Willie Glaster Jr. To my knowledge he's never been in any kind of trouble until this mess he got himself in. I'll try and explain why I think this happened. We always thought Karriem was a little different but we as a family didn't take it seriously. He never hurt anybody or got into fights in all these years, most of the time he was just a big old playful person. We didn't find out until recently the Veterans Administration diagnosed him functionally Autistic with a 100% disability. But no one seemed to realize he was going through a lot. When he got married, he was very happy. About 2 years ago his marriage started to sour. He said his wife started leaving him home by himself all the time. That's when all the porn surfing started. To My knowledge he has never physically harmed anyone.

He has already been seeking help with his problem, VA. Is going to help him. I think that jailing him for a long period of time would do more harm than good. Hope that you will take what I'm saying when you make a judgment in this case.

Thank You and God Bless!! Willie Glaster Jr: [signature]

**B3**

**Brenda Gipson Jimenez** Jul 26, 2026,

Dear Honorable Judge Byron, my name is Brenda Gipson and Karriem Glaster is my nephew. When I got the news about what Karriem charges were I was and still am in disbelief not just because Karriem is my nephew but it's because I know who he is. Judge I understand you don't know the Karriem we love and know very well, my nephew is smart, funny and has a heart of gold. He's VERY talented. Judge Byron Karriem can make anything out of pipe cleaners and if he was home, he would be right here helping me move on the 2nd. I just looooooove and miss my nephew sooooooo much. We the family can really feel the presence of his absence and honesty I hate the way it feels and I pray every day for his return and im not going to stop until Karriem Glaster is home where he belongs. Honestly Judge Byron, Karriem is a great man that needs to be home with his family that looooooove him

Thank you so much for your time

Sincerely Brenda Gipson

Brenda Gipson 7-26-26

B4

To the Honorable Judge Byron,

My name is Harvey L. Mitchell Jr. I am the husband of Zanika Mitchell, who is the cousin of Karriem Glaster. I was absolutely shocked regarding the charges brough against Karriem. I know that Karriem has Autism and has had bouts with mental health issues. I believe that these factors may have altered his decision-making capability regarding this situation. Karriem is caring, loving, funny and one of the most thoughtful people I have ever met. Karriem has been instrumental in helping to babysit and raise all 5 our children. He has always treated them and loved them as if they were his own. We shared common interests in art and sports. We both are huge San Francisco 49er football fans and he was able to merge the best of both worlds. He is very proficient at creating figures from wire pipe cleaners. He made me one of my favorite football player at the time Raheem Mostert. As usual, he is always thoughtful and caring to give of himself and his art. It is indeed a gift for him to create these amazing figures down to the smallest details. Karriem was at home outdoors. He loves to take long hikes, see beautiful landscapes and take in nature. He was looking forward to enjoying retirement and spending his days traveling the world.

I recognize that he did something wrong and he will be facing the consequences of his actions. I, like the rest of our family, will be there to support him throughout as we have throughout the course of everything so far. Thank you so much Honorable Judge Byron for reading this letter.

Sincerely,

Harvey L. Mitchell Jr.

**B5**

**From:** Comisha Payne
[redacted] [redacted]

[redacted]

[redacted]

[redacted]

To the honorable Judge Byron,

My name is Comisha Payne. I am the Best Friend of Karriem Glaster cousin Zanika.
I have known Mr. Glaster for well over 30 years. I was shocked when I heard he was charged with this offense and was in total disbelief. I believe his Autism diagnosis must have played a huge decision in his decision making because that is so far off from his natural character. I am also a witness to the mental health challenges he has been experiencing as of late that may be affecting his decision making as well. Karriem is nothing short of the most kindest and gentlest of human beings when it comes to children. I wouldn't trust anyone more than myself with my children besides him. When my oldest son was turning two years old (he is 28 now), Karriem took all the children outside and bought each child their own individual ice cream from the ice cream truck even though we provided ice cream with the cake which some kids did not want. I knew Karriem was different from the very first time I met him because he has always had innocent and naïve nature about him even still until now. He is always been passionate about his artwork and creating action figurines made from pipe cleaners which as always been fascinating to me that he has such an unique talent which I have been amazed and a little jealous of. He has had some challenges since coming back from the military which I always was so parallel to his personality. If what he is accused of is proven accurate and he did indeed do something wrong then of course I believe he should face the appropriate consequences but I believe all of the above should be factored in as well. I will always be part of his support system and will help him in any way possible. That is how much I know and believe in him. Thank you for taking the time to read my

letter and hope it gives more insight to the person he truly is.

Sincerely,
Comisha Payne

B6

To the Honorable Judge Brown,

My name is Zanika Mitchell and I am Karriem's first cousin. When I initially heard of Karriem's arrest I screamed I cried I collapsed to my knees. It was a huge mix of emotions from shock and disbelief to disappointment and anger. Then when I had time to sit back and think about the actual charges I just couldn't wrap my head around it. Like the accusation(s) and the person accused just didn't match.

As Karriem's 1st cousin I've known him my entire life, Karriem has lived with me several times for several years at a time. My door has always been open to him. He's taken care of our children countless times. We lovingly called him our "Manny". Karriem would take my kids to and from daycare and school, he would also cook and clean while my husband and I worked.

I've known for as long as I can remember that Karriem wanted children. He wanted a mini version of him and whoever chose to bless him with at least one child. With that being said I was surprised when he chose a wife that couldn't provide that for him. I was sure that would be a deal breaker in his relationship and for sure a marriage. I know him and Kim did seek fertility treatments even asking me to possibly be a segregate. I was on board because I knew this is something he's wanted his entire life and if I could help them with that I was more than happy to do that. Unfortunately that never came to be.

That is the number one reason when I got pregnant with my daughter it was a no brainer to ask him to be her Godfather. Yes Karriem is my youngest daughter Zahara's Godfather and I would choose him again and again.

I believe him being autistic play a role in his life on a daily basis. From him dating later on in life which led to him getting married later on in life. He has always been a little different but being younger I didn't know what it could be. But when we got older and he told me he was diagnosed with Autism it all made sense. Of course we notice his quirks and make fun of them but looking back there are things that he does or did that got brushed off as "just Karriem things" but they were things I guess made so much sense to him that he had to do them THAT way. Things like how he doesn't like if the ratio of hotdog buns to hotdogs were off, he absolutely had to see a movie if not opening night opening weekend. He is very ritualistic and pretty much has a routine when it comes to certain things.

When he was younger Karriem has ALWAYS made something, he would walk around with bread ties to make a stick figure guy out of them. Which later instead of leaving everyone with stale bread my mom Brend Gipson suggested he used pipe cleaners which blossomed his stick figures into action figures and now a true work of art.

Karriem is a gentle giant , he's the silly uncle, he's the one who the kids flocked to, he's the one who babysat so the parents could have a break, he's the one who you could count on to simply show up and show support. Show up financially, show up to the birthday parties, the pageants, gymnastics, show up to the softball games, show up to the football, volleyball, track and basketball games.

Karriem has always loved nature and the outdoors, he spoke for years about this hike that he wanted to take I laughed and compared him to Forrest Gump, but I knew he would do it. He put his mind to it, mapped it out and that was that. He bought so much equipment to prepare, he told me about things he bought for his hike that I didn't even know existed but were smart to have and of course he would find it. He did his homework on the trails and the routes and how long he would be at one spot. I never doubted he would be able to achieve that goal he was very determined. I was sad for him when something came in the way of him going as he lit up when he talked about it and was very excited to go.

I do recognize that what he is charged with if he is guilty I feel he has already suffered the consequences of those actions. I do feel there were many things that had they not been done it never would have led up to his actions. I have be there for him as I've always been because I really love and care for him and believe he can thrive with us again as his family has always been important to him and he is very family oriented.

I know you must be very busy so I would like to thank you so much for taking the time to read my letter and to take my words into consideration with this matter.

Sincerely,

Zanika Mitchell

C

# This is Karriem Glaster



These were the monumental points in Mr. Glaster's life. These monumental moments exemplified how Mr. Glaster worked through his disability to graduate high school, get inducted into the military to serve his country, and subsequently getting accepted and graduated college. Although he did experience struggles along the way, he persevered and made some tremendous accomplishments.

# Spending time with family







These were the moments that Mr. Glaster charished the most, which was to spend time with his family. His family has been fully supportive of his journey. They have and has continued to help him with various tasks and assuring that he makes sound decisions.

# Mr. Glaster's Relationship







Mr. Glaster found someone that he was passionately in love with, who also has disabilities. Unfortunately, once he gets released from serving his sentence, they will no longer be in a relationship. This has taken a toll on him, however he has recognized his role in the demise of his relationship. The top two photographs are pictures from his wedding. The bottom photo was of them spending time at an Art museum, which is one of Mr. Glater's passion.

# Mr. Glaster's Primary Support System




The person who has given Mr. Glaster unwaivering support is his mother Gail Glaster. She's a retired police officer who worked with the Mare Island Police Department, the Okland Army Base Police Department, and finally the Walnut Creek Police Department. She was a sworn officer of 30 years who retired a few years ago. Mr. Glaster wanted to follow in his mother's footsteps to become an officer however due to his disabilities, he wasn't able to.

# Employment





This is a photograph of Mr. Glaster at his worksite. He was employed doing construction with Amazon. As a requirement, it was mandatory for employees to wear a mask.

# Mr. Glaster's Passion
















Mr. Glaster is extremely passionate about his art. He created figurines and all sorts of sculpted figures with small wires by hand. He has a web page and had his art introduced at exhibits. People purchased his art, however he doesn't create for money, he actually makes them, then gift them to family and friends.

Patch

Sign up

Sacramento, CA

Subscribe

News Feed | Events | Local Businesses | Classifieds

Thank you to our Local Business Sponsor: Heritage Exteriors Windows And Siding

This post was contributed by a community member. The views expressed here are the author's own.

Home & Garden

# Rancho Cordova Disabled Veteran receives much-needed gift

Lennox and Bonney partnered to provide an army veteran with heating and cooling equipment free of cost



**Lilly Wyatt**, Community Contributor

Posted Sat, Oct 10, 2020 at 1:19 pm PT

0



Feel the Love recipient excited to see his new gift (LWPR)




Sacramento, CA. (Saturday, October 10, 2020) – A Rancho Cordova disabled veteran received a new heating and air conditioning unit from Bonney and Lennox this Saturday during their national “Feel the Love” event.

ADVERTISEMENT

Bonney began requesting nominations in June from community members to help those facing physical, mental, or social disabilities, financial challenges, or job loss. Military, community service and local hometown heroes were also critical factors for choosing a Feel the Love recipient.

“We received more than 50 nominations from across the greater Sacramento region,” said Oscar Poort, General Manager of HVAC and Electrical for Bonney. “The committee chose Karriem Glaster from Rancho Cordova as we learned he was a disabled veteran that served in the army, he has asthma and just didn’t have the resources to replace a non-working unit since he moved to his house over five years ago. He works hard putting others in the community first. It seemed like a natural fit.”

Find out what's happening in Sacramentofor free with the latest updates from Patch.

Your email address Subscribe

Skip Ad

For the past 10 years, Lennox'd Feel The Love program has donated heating and cooling equipment to help deserving residents across the country, helping more than 1,300 families stay comfortable and safe in their homes. This is the first year that Bonney has taken part in the social responsibility event, and says they will continue to do so for years to come.

"It's been tough living in a house with a non-working system that's more than 27 years old," said Karriem Glaster, an army veteran from Rancho Cordova. "As a homeowner, you always have a lot of conflicting priorities and we just didn't have the money to buy a new furnace and air conditioning system, so this is a great and much needed surprise. I'm in shock and very grateful."

ADVERTISEMENT

Karriem and his wife Kimberly are celebrating their fifth anniversary since moving to their home on the same day as they are receiving their new system, providing them much needed relief.

"It's overwhelming to me because I'm getting chills just thinking about it," said Kimberly Glaster, Karriem's wife. "This winter I'm not going to be freezing like normal with my blanket and my hat and my gloves, it's just going to be so nice."

JOIN THE CONVERSATION 0

E

49 Law & Psychol. Rev. 145

**Law & Psychology Review**
2024-2025

**Contributed Article**
Jenna Hayes, MA[a1]

Copyright © 2024 by The University of Alabama School of Law; Jenna Hayes, MA

# AUTISM, CULPABILITY, AND SENTENCING DECISIONS

*Autism spectrum disorder (ASD) is characterized by certain social deficits and restricted, repetitive patterns of behaviors or interests.*[1] *While autism has become increasingly prevalent within the criminal legal system, courts have yet to develop a consistent manner of dealing with evidence of autism in determining culpability, blameworthiness, and appropriate punishments. This article provides a brief overview of the relationship between autism and criminality and reviews criminal cases involving defendants with autism to highlight how each court's unique approach to considering defendants' autism creates wide variation in case outcomes. The author offers a potential solution to this inconsistency: legislation that would guarantee expert testimony is provided and appropriately considered in cases involving defendants with autism. This would allow all courts the opportunity to better understand the nuances of each individual's disability, better estimate their blameworthiness, and assign more appropriate sentences.*

**Table of Contents**

I. Autism and Criminality 147
II. Overview of Autism in Criminal Proceedings 150
*A. Perceptions of Autism in the Courtroom* 152
*B. Autism and Criminal Intent* 156
*C. Autism as an Insanity Defense* 159
*D. Autism as a Diminished Capacity Defense* 162
III. Overview of Autism in Sentencing Decisions 164
*A. Autism as Mitigating: Successful Downward Departures* 165
*B. Dismissals of Autism Evidence in Sentencing Decisions* 168
IV. Addressing Inconsistencies 170
V. Admissibility of Expert Testimony on ASD 171
VI. Proposed Solution 176
VII. Potential Counterarguments 177
VIII. Conclusion 179

***146** The Centers for Disease Control and Prevention have identified autism spectrum disorder (ASD), or more commonly, “autism,” as the fastest-growing developmental disorder in the United States, with approximately one in 36 children having received the diagnosis.[2] Considering the United States' extremely high incarceration rate along with the rising prevalence of autism, it is becoming increasingly important for researchers to explore the ways that autism can influence criminal case outcomes.[3] Further amplifying the necessity of research in this area are findings that those with autism are disproportionately more likely to become involved in the criminal legal system than those without autism.[4] Chester and colleagues offer a number of potential explanations for the overrepresentation of ***147** people with autism in certain forensic samples, suggesting that they may be more likely to be caught for their criminal behavior, confess during police interviews, enter a guilty plea before considering and understanding alternatives, or fail to advocate for their rights in court.[5] Despite how common autism has become in the legal system, minimal consideration is afforded to this population as it relates to criminal proceedings.

## I. Autism and Criminality

As outlined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5-TR), individuals with autism demonstrate persistent deficits in social communication and interaction across multiple contexts as well as restricted, repetitive patterns of behaviors (e.g., hand flapping, lining up items), interests (e.g., having very specific knowledge about microwaves), and/or activities (e.g., inflexible adherence to routines).[6] While both of these core symptoms (i.e., social deficits and restricted, repetitive behaviors) must be present in some capacity to constitute a diagnosis, autism exists on a spectrum, so the disorder manifests uniquely in each individual.[7] Previous versions of the DSM offered separate diagnoses for "autistic disorder" and "Asperger's disorder."[8] Those diagnosed with Asperger's were differentiated from those with autism in that they did not experience clinically significant delays in language, cognitive development, or the development of age-appropriate adaptive behaviors.[9]

The updated diagnosis of autism spectrum disorder (ASD) now encompasses all individuals who met the criteria for either autistic disorder or Asperger's disorder.[10] Given the wide range of functioning captured under an ASD diagnosis, the APA offers specifiers for clinicians to use when providing diagnoses to indicate the "severity" of each individual's social communication impairments and restricted, repetitive patterns of behavior.[11] Clinicians choose from three levels of impairment: Level 1 ("Requiring support"); Level 2 ("Requiring substantial support"); and Level ***148** 3 ("Requiring very substantial support").[12] They also specify whether the autism diagnosis is with or without accompanying intellectual or language impairments.[13]

While there is a lack of consensus regarding the relationship between criminality and autism,[14] data shows that the vast majority of individuals with autism do not commit criminal acts.[15] People with autism are less likely to offend than people without autism of the same age and gender.[16] In fact, researchers in this area agree that people with autism are more likely to be victims of crimes than they are to commit them.[17] For those individuals with autism who do commit crimes, certain symptoms associated with the disorder have been implicated in their development of criminality.[18]

Although each offender with autism is unique and should be assessed individually by a court, most people with autism who exhibit criminal behavior are thought to do so as a result of specific traits, including poor impulse control, fixation on specific interests, deficits in cognitive empathy, difficulty regulating emotions, and a lack of understanding of social cues, personal space, and the effects of one's behavior.[19] Additional factors that may predispose individuals with autism to commit ***149** crimes include aggression resulting from disrupted routine or social misunderstanding and obsessive behavior without understanding its implications.[20] People with autism are also at an increased risk of being taken advantage of in both social and professional settings,[21] so it may be that these individuals are also manipulated and pressured by others in ways that lead them to commit crimes.

To further investigate the connection between autism and criminality, researchers have looked to case histories of offenders with autism and identified themes among these cases, including interpersonal naiveté, inappropriate attempts at forming relationships, and threats to harm others in the context of perceived wrongdoings.[22] Many of the individuals in these cases were quick to confess to their charges, which could reflect a lack of appreciation for the consequences of a confession.[23] A propensity to honesty is characteristic of many individuals with autism,[24] so a quick confession could also result from "a personal view that their actions were justified and hence a lack of feeling any guilt."[25] Furthermore, individuals with autism are thought to be more susceptible to interrogative pressure and more easily manipulated during police questioning due to social deficits associated with the disorder.[26] Regardless of how people with autism come into contact with the criminal legal ***150** system, research in this area reveals that the particular needs of this population are often overlooked.[27]

## II. Overview of Autism in Criminal Proceedings

Individuals with autism may face a variety of unique barriers as they navigate criminal proceedings. Defendants with autism can even experience difficulties prior to their arrest, as those with autism often report negative interactions with police as a result of communication difficulties or certain behaviors, like stimming (i.e., self-stimulating behavior[s] such as hand-flapping, head-banging, spinning, rocking, etc.),[28] that police officers may misinterpret as aggression or noncompliance.[29] One advocate maintains that an autism diagnosis is "as relevant to police and legal proceedings as a diagnosis of mental retardation [*sic*] or mental illness would be, no matter how bright, high-functioning, and/or verbal the individual may be."[30] While judicial consideration for autism has become more common in recent years, researchers in this area stress the importance of properly considering the significance and effects of autism before prosecution even begins (e.g., police interviewing and competency to stand trial evaluations) in responsibility determinations for criminal liability and throughout sentencing proceedings.[31]

Of particular concern are the ways that traits of autism can directly impact the interpretation of a defendant's culpability and the severity of their punishment. Fortunately, expert witness testimony in cases involving defendants with autism may be used to educate judges and juries on the nuances of the disorder and how it influences behavior.[32] However, judges and/or attorneys must first become aware of the defendant's autism and realize that their symptoms may have affected their ***151** culpability before seeking an expert.[33] Even then, expert witnesses are typically paid by the party requesting their services and often charge high fees that many cannot afford.[34] While public defenders can apply for funding to hire an expert witness, the government does not always approve these requests.[35] The court may appoint any expert that both parties agree on or any expert of its own choosing,[36] but expert testimony is not always obtained or considered in cases involving defendants with autism.[37]

Even if expert testimony is allowed, courts are not equally responsive to testimony about the challenges that confront individuals with autism and how these challenges might be relevant to their alleged offense(s).[38] Results from an interview-based, qualitative study examining judges' perceptions of offenders with autism indicated that judges differed in their opinions regarding whether traits of autism affect a defendant's ability to formulate intent and whether they are culpable for their crime(s).[39] In a later study, Berryessa found that some judges considered autism as a potential mitigating factor in their judgments regarding culpability and sentencing, while others did not.[40] Such studies elucidate the inconsistency with which evidence of autism is integrated into judicial decision-making.

An example of autism complicating criminal proceedings is the case of *State of Western Australia v. Mack*, in which Mack, a man with autism, was charged with murdering his mother.[41] He applied for trial by judge alone, and questions were also raised about his competency.[42] At the hearing to address these matters, Justice John McKechnie of the Supreme Court of Western Australia noted that the defendant was "averting all eye contact, keeping his head down, staring at the corner of the ***152** dock" and was occasionally "twitching or shaking."[43] While Justice McKechnie recognized the defendant's "mental impairment due to autism," Mack was ultimately deemed competent. The Justice said, "There is no doubt that a trial judge will have to be responsive to the problems that the accused's autism raises in relation to the conduct of the trial to ensure that the trial is fair and that the accused is given adequate opportunity to instruct his counsel and make a proper defense."[44]

At his trial, Justice McKechnie ultimately found Mack guilty of murder and sentenced him to life in prison.[45] In this trial, neither the prosecution nor the defense presented expert testimony about Mack's autism.[46] Instead, Mack's defense lawyer highlighted Mack's unusual personality and demeanor.[47] In his decision, Justice McKechnie acknowledged that Mack's behavior was "certainly odd," but he stated that there was no evidence to support that "the accused suffer[ed] from any personality disorder or mental condition."[48] In fact, the word "autism" is never mentioned in his decision, despite Justice McKechnie's previous acknowledgment of Mack's autism (which is indeed a mental disorder listed in the DSM)[49] in his decision regarding Mack's competency to stand trial.[50] Mack eventually appealed his conviction and sentence in 2014, again citing his autism, but his appeal was denied.[51]

### *A. Perceptions of Autism in the Courtroom*

As mentioned above, different courts have different approaches to considering evidence of a defendant's autism.[52] In her survey of judges, Berryessa found that most judges in her sample identified a diagnosis of autism as a potential mitigating factor in their judgments regarding responsibility determination and sentencing.[53] However, another study reported that a small number of judges in their sample admitted that they might consider a diagnosis of autism to be aggravating to sentencing because it could be indicative of a higher risk of recidivism due to the disorder's ***153** impairments to impulse control.[54] While the majority of research in this area reports that judges are generally sympathetic to those with the diagnosis, some judges are unsure if and how information about autism should inform their sentencing decisions.[55] Further, judges reported relying upon expert assistance to make decisions regarding defendants with autism, emphasizing the importance of expert testimony in these cases.[56]

*State v. Burr* highlights the importance of considering the unique traits associated with autism. In this case, the defendant was convicted of second-degree aggravated assault and third-degree endangering of a minor and sentenced to six years imprisonment and a lifetime of community supervision.[57] The judge was "alarmed by [the] defendant's odd appearance and demeanor" and requested a competency evaluation.[58] The defendant was diagnosed with "Asperger's Disorder" (which now falls under the umbrella of autism spectrum disorder).[59] However, the trial court excluded this evidence, and the defendant chose not to testify.[60] On appeal, the defendant claimed that he was prevented from a fair trial because the jury did not understand him due to his diagnosis, which also prevented him from testifying at his trial.[61] He stated:

> Because of my autistic condition, I always put my foot in my mouth. I always say something that irritates people and gives the wrong impression. It's dangerous for me to get up and speak because all my life I say things that annoy people when I didn't intend to do it. I can't trust myself to speak. My lawyers can't trust me to speak. It's not a good idea for somebody like me in any situation, especially in a court.
>
> ...
>
> My lawyers urged me many times not to get up and speak because of my autistic condition, they know that I always say things that embarrass myself and upset other people.[62]

***154** On appeal, the court agreed that the defendant was "entitled to a new trial," citing the trial court's rejection of the defendant's request to present expert testimony regarding his diagnosis.[63] The appellate court stated that the barred testimony would have educated the jury about behavioral oddities that the defendant might exhibit in court or were described in the witnesses' testimony.[64] Proper consideration of defendants' autism is essential to ensuring proper treatment of these individuals throughout criminal proceedings.

Some of the features associated with autism may lead individuals to say things that are deemed socially inappropriate, make "awkward" facial expressions, or demonstrate a lack of empathy due to deficits in theory of mind (i.e., the inference of others' emotional states).[65] If they are unaware of a defendant's autism, characteristics associated with the disorder risk misinterpretation by police, evaluators, judges, and juries.[66] For instance, if a person with autism never received a formal diagnosis or chooses not to volunteer their diagnosis to police upon their arrest, they may be perceived as having acted willfully and intentionally during interrogation because of their discomfort with the new environment, change in routine, and heightened stress.[67] Characteristics such as poor problem solving, heightened acquiescence, and susceptibility to coercive questioning tactics can further obscure criminal intent among those with autism.[68]

Given the social and communication deficits associated with autism, these individuals may even be seen as exhibiting antisocial characteristics, which can have a profoundly aggravating effect on sentencing considerations.[69] Antisocial personality disorder (ASPD) is characterized by repeated disregard or violation of others' rights.[70] Individuals with ASPD may act impulsively, violate the law, and lie, deceive, or manipulate others, typically without showing remorse or guilt.[71] Autism and ASPD share a few notable characteristics, including difficulties with social ***155** information processing and expressions of empathy.[72] However, ASPD is characterized by a lack of caring about other people,[73] while autism is characterized by problems with cognitive perspective-taking, which can be misinterpreted as a complete lack of empathy.[74] However, while many people with autism show impairments in cognitive empathy (i.e., inferring the thoughts of others), they do not differ from controls in emotional empathy (i.e., feeling empathetic concern).[75]

If courts are unaware of a defendant's autism, they might misinterpret their social difficulties and lack of displayed empathy as products of antisocial personality disorder, which is associated with high recidivism rates[76] and resistance to psychotherapeutic interventions.[77] Because ASPD is viewed as difficult to treat and predictive of future offending behavior, courts typically consider ASPD as an aggravating factor in sentencing decisions.[78] Psychologists, lawmakers, and laymen also tend to exclude ASPD as a valid mental illness that qualifies as decreasing responsibility because ASPD is generally defined by socially deviant behavior.[79] It is imperative that legal personnel, particularly judges, become at least somewhat familiar ***156** with the specific symptoms of autism to minimize the risk of misjudging these traits in defendants and assigning disproportionate sentences.

### *B. Autism and Criminal Intent*

If one lacks the ability to form criminal intent, they cannot satisfy a basic element of most crimes (i.e., mens rea)[80] and cannot be justly convicted of these crimes.[81] A defendant must be conscious of "the facts that make his conduct fit the definition of the offense."[82] Whether a person with autism has the capacity to form all or part of the criminal intent required to be convicted of their crime is a multifaceted issue that should be provided the same consideration offered to individuals with

intellectual disability or severe mental illness. Woodbury-Smith and Dein contend that autism "is associated with significant socio-emotional impairments, that may, arguably, affect the ability to form intent."[83]

Some of the specific socio-emotional impairments associated with autism include difficulty interpreting nonverbal cues,[84] poor impulse control,[85] obsessiveness with pursuing specific interests,[86] trouble understanding the viewpoint of others,[87] lacking awareness of others' personal space,[88] and failing to recognize the implications of one's behavior.[89] Individuals with autism may also have a limited understanding of social norms related to sexual interactions, which can result in sexually inappropriate behavior without ill intent or appreciation for the implications of their ***157** behavior.[90] Given these impairments, some of the most common offenses committed by people with autism include sexual offending[91] and stalking.[92]

First consider the crime of "stalking," or engaging in behavior directed at a specific person that would "cause a reasonable person to fear for his or her safety or the safety of others" or "suffer substantial emotional distress."[93] The social impairments commonly observed in those with autism can result in these individuals unknowingly exhibiting behaviors that equate to stalking.[94]

When compared to individuals without autism, people with autism have been found to be more likely to engage in inappropriate "courting behaviors," to focus their attention upon celebrities, strangers, colleagues, and ex-partners, and to pursue their "target" for longer periods of time.[95] In most states, the stalker must display a criminal intent to cause fear in the victim in order to be convicted of stalking.[96] In a recent stalking case where the defendant made violent threats toward the victim, the Supreme Court of the United States ruled that the state must prove that the defendant had some subjective understanding of his statements' threatening nature.[97]

If a person with autism engages in stalking behaviors without the intent to harass or harm, and without awareness that others may interpret these behaviors as socially inappropriate, bothersome, or illegal, they should be considered unable to form the requisite criminal intent to be convicted.[98] Recognizing and accurately interpreting others' emotional states is essential for successful social interactions, so those who lack this ability are likely to experience frequent misunderstandings in ***158** social situations.[99] Further, individuals with autism may not fully comprehend that what they have done is wrong or even recognize that they will be prosecuted for their behavior. If someone lacks criminal intent and an understanding of the criminal nature of their behavior, it should follow that they are not held fully responsible for their crime(s).[100]

Ventura and colleagues present a recent case report of a man with diagnosed autism who received criminal charges related to a "previously unknown stalking behavior."[101] For several months, he had been randomly selecting people from the telephone directory, memorizing their contact information, and repeatedly calling them from public phones, and one of the victims eventually initiated formal criminal charges.[102] It was noted that the defendant prided himself on his ability to memorize details about others and show them how much he knew about them so they would think he was intelligent.[103] According to the report, the man did not display remorse for his behavior, as he believed his actions to be a "straightforward path to making friends" and considered his interests to be reciprocated, "over-evaluating platonic interactions."[104]

After considering a partial insanity defense, the defendant was given a forensic psychiatric evaluation and ordered to treatment in lieu of prosecution.[105] He was referred to an Adult Neurodevelopmental Disorder Psychiatry Unit, where he was treated with medication and individual cognitive behavioral intervention to improve his social-cognitive functioning.[106] The report indicated that he showed "complete remission and disapproval of stalking behaviors" following treatment.[107] He was released under his mother's supervision and later moved into a treatment facility specializing in autism, where he found work in a supported employment program.[108] This case highlights the importance of legal personnel appreciating how characteristics of autism may reduce culpability and seeking expert evaluation as needed to improve outcomes for defendants.

### ***159** *C. Autism as an Insanity Defense*

Given the potential influence of autism on a defendant's ability to form the requisite mens rea for their crime(s) and appreciate the criminality of their actions, a defendant with autism could theoretically attempt to use an insanity, or Not Guilty by Reason of Insanity (NGRI), defense.[109] States utilize different versions of the United States federal standard for insanity, which holds that, "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts."[110] When a defendant pleads insanity, they admit to the action for which they are being charged but assert a lack of culpability based on their mental condition.[111] There are four states (Kansas, Montana, Idaho, and Utah) that explicitly do not allow for an insanity

defense.[112] The rest of the states generally rely on one of four different tests to determine whether a defendant is legally insane (i.e., the M'Naghten Rule,[113] the Durham Rule,[114] the Irresistible Impulse Test,[115] and the Model Penal Code[116]).[117]

Under the M'Naghten Rule, a defendant must have, at the time of their crime, had a mental disease or defect that interfered with their ability to understand the nature of their act or its wrongfulness.[118] Defendants are presumed to be sane unless they can prove that, at the time of their crime, their mental state caused them to be unaware of what they were doing or be unaware that what they were doing was ***160** wrong.[119] Examples of situations in which someone might have been unaware that their behavior was wrong include individuals acting on orders from "God" or following the instructions of a trusted authority figure who had convinced them that they were doing the right thing.[120] The Irresistible Impulse Test focuses on the ability of the defendant to control their behavior at the time of their crime.[121] In other words, this standard applies if the defendant, because of their mental disease or defect, could not resist the impulse to commit the crime of which they are accused. As previously mentioned, many individuals with autism experience poor impulse control that makes it difficult to resist certain urges.[122]

The Model Penal Code combines the premises of both of these standards, stating that the insanity defense applies when a defendant, because of a diagnosed mental disorder, is unable to understand the criminality of their actions or conform their behavior to the law.[123] Thus, defendants with autism might successfully use the insanity defense in jurisdictions utilizing the Model Penal Code if they can prove that they either (1) did not know what they were doing was wrong or (2) were unable to control an impulse that led to the criminal act.[124] The final test used for determining insanity in the United States is the Durham Rule, or the product test, which holds that the insanity defense applies if a defendant's mental disease or defect was the reason they committed the crime.[125] A version of the Durham Rule is used only in New Hampshire, as other states have thought it to be too general and difficult to apply.[126]

The way that a particular jurisdiction conceptualizes insanity has important implications for defendants with autism and whether they meet the criteria for an insanity defense. Jurisdictions considerably vary in their statutory language, but "the most common NGRI prerequisite condition is a mental disease or defect."[127] Most jurisdictions do not explicitly define which diagnoses qualify for an insanity defense, but "legal scholars and forensic examiners generally consider 'mental disease' to include severe episodic psychiatric disorders that develop and wax and ***161** wane during one's life, such as psychotic and mood disorders."[128] Scholars and examiners typically interpret "mental defect" to include "stable, nonprogressive psychiatric disorders" such as intellectual disability and autism.[129]

In jurisdictions that use other terms in their statutes, such as "mental illness," autism may not even qualify as an acceptable diagnosis for use with the insanity defense, as ASD is technically categorized as a developmental disorder rather than a mental *illness*.[130] Even if defendants do qualify, it is important to note that insanity defenses rarely succeed, and when they do, the underlying mental condition typically involves psychosis.[131] In fact, one of the only documented cases where a diagnosis of autism was involved in a successful insanity defense involved a defendant who also experienced episodes of depression and psychosis.[132]

Lastly, autism is generally unsuitable as an affirmative defense due to its nature as a spectrum, which makes it extremely difficult for legislation to produce an objective rule that accounts for the immense variation between individuals. For this reason, expert witness testimony is crucial in cases where evidence of autism is raised or suspected. Rule 704 (Opinion on Ultimate Issue) of the Federal Rules of Evidence specifies that expert testimony should focus on the defendant's diagnosis, mental state, and motivation at the time of the alleged crime,[133] but determining whether the relevant legal test for insanity has been met is a matter for the court.[134] Regardless, experts can provide judges and juries with important information about autism and its potential effects on culpability.[135] In her research, Berryessa found that judges generally agree that "high-functioning" offenders with ASD "view the world in a unique way, much of their behavior is not directly under their control, ***162** and they are inherently different than other offenders and should be treated as such," emphasizing the need for more education from expert witnesses.[136]

### *D. Autism as a Diminished Capacity Defense*

Many offenders with autism should be considered less culpable for their crimes, but they are rarely completely devoid of intent or understanding. When a defendant has some amount of criminal intent but factors such as a mental illness/disorder or low intelligence reduce their intentionality, the defendant is said to have "diminished capacity."[137] Unlike the insanity defense, which is an affirmative defense, diminished capacity is a partial defense that does not suggest a complete lack of criminal responsibility.[138] A successful diminished capacity defense results in a defendant pleading guilty to a lesser crime and accepting some criminal responsibility but arguing that mitigating factors reduced the intent element.[139] The diminished

capacity plea is based on the principle that certain people, due to mental impairment or disease, are genuinely incapable of forming the requisite intent of their crime(s).[140]

A diminished capacity defense may be used successfully in cases where the defendant with autism is able to prove to the court that they experienced a significantly reduced mental capacity that substantially contributed to their criminal offense. However, the nuanced ways that the social and communication deficits associated with autism manifest across individuals with the disorder may not be immediately noticeable to those who are unfamiliar with autism. While these symptoms may not present as prominently as those associated with other disorders (e.g., psychotic disorders), they can still have a major influence over one's thinking patterns, decision-making process, and behaviors.[141] Thus, claims of diminished ***163** capacity may be wrongfully dismissed if a defendant's autism has not been diagnosed or disclosed to the court or if their symptoms are not readily apparent to the court (whether that be because the individual has learned to "mask" their symptoms or because the people in the courtroom lack the ability to recognize their symptoms). The ability of legal personnel to recognize specific traits in defendants that may be indicative of autism can play a major role in determining whether defendants receive fair, proportionate punishments.

In a recent case from the United Kingdom, ASD was successfully used as a defense against murder.[142] Aaron Matthew was arrested for stabbing his mother to death in 2021.[143] Matthew had not yet been diagnosed with autism, but the defense noticed abnormalities in his behaviors and utilized expert witnesses, a psychiatrist and a psychologist, to evaluate Matthew.[144] They diagnosed Matthew with "severe ASD," and noted that "social disadvantage barriers" and the COVID-19 pandemic had played significant roles in his condition having been undiagnosed until this point.[145] Matthew pled guilty to manslaughter on the grounds of diminished responsibility, and the defense's experts presented evidence as to how the symptoms associated with autism affect social behavior and daily life.[146]

At trial, the defense team presented evidence that Matthew "suffered severe ASD" and was "having difficulty in coping, predicting outcomes and fully understanding the consequences of his actions."[147] The prosecution's expert, a psychiatrist, ultimately agreed that, at the time of the murder, Matthew's autism likely "impacted [his] mental functioning and ability to exercise self-control ...."[148] In the United Kingdom, those convicted of murder receive a mandatory life sentence and must serve a minimum term, whereas those convicted of manslaughter can receive sentences up to a maximum of life imprisonment.[149] Nonetheless, Matthew was ***164** given a life sentence and ordered to serve a minimum of six years and 226 days after the judge deemed him a "serious risk to the community."[150]

Even when a defendant's autism is identified and presented to the court, like in Matthew's case, not all jurisdictions allow for a plea of diminished capacity.[151] In fact, some trial courts do not recognize mental defects as a justification for criminal conduct.[152] Even if a jurisdiction *does* allow a diminished capacity defense, it often requires defendants to meet certain parameters associated with an insanity defense and limits how lawyers can use expert testimony.[153] So, depending on the jurisdiction, some defendants with autism may be ineligible to argue their diminished capacity. In these cases, defendants must rely on judges to consider evidence of their autism during sentencing.[154]

## III. Overview of Autism in Sentencing Decisions

When an autism diagnosis does not exempt a defendant from conviction, it should still be carefully considered as a potential mitigating factor in the evaluation of the defendant's intent, capacity, and responsibility.[155] A mitigating factor is any fact or circumstance about the offense or the defendant that persuades the judge to impose a less harsh sentence.[156] While jurisdictions vary in their recognized mitigating factors, commonly accepted mitigating factors include developmental disability, a substance addiction that contributed to the crime(s), and a clean criminal record.[157] Defendants with a mental illness or disorder may be viewed as less culpable and less blameworthy than those who act intentionally and maliciously, but the policymakers rarely consider such defendants completely blameless.[158] This "middle ground" of moral blameworthiness can be hard to determine in the context of a defense, but when used as a mitigating factor during sentencing, a judge can ***165** utilize a wide variety of evidence and testimony (e.g., medical history, employment, education, family history) to consider how much "punishment" is appropriate and adjust the defendant's sentence accordingly.[159]

The Federal Sentencing Guidelines state that a downward departure to sentencing (i.e., a sentence that is lower than the minimum sentence suggested by the sentencing guidelines) may be warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."[160] Similarly, downward variances are sentences outside of the guideline range that are "not imposed within the guidelines framework" but are instead based upon the statutory sentencing factors found at 18 U.S.C. § 3553(a).[161] Downward departures and variances help ensure that defendants will be punished for their crime(s)

while still receiving sentences that are proportionate to their level of culpability.[162] It is important to note that an autism diagnosis does not guarantee leniency during sentencing.

### *A. Autism as Mitigating: Successful Downward Departures*

While the Federal Sentencing Guidelines do not require courts to consider evidence of autism as mitigating, autism has been successfully used to achieve downward departures or variances in several child pornography cases.[163] For instance, a downward departure was granted in *United States v. Huseth*, in which the defendant was charged with and pled guilty to possession of child pornography.[164] In his motion for a downward departure, Huseth cited his autism diagnosis, significant cognitive impairments, particular vulnerability to manipulation due to his autism, and his need for treatment.[165] The defense acknowledged that Huseth had intentionally possessed child pornography and that his autism did not *cause* him to possess child pornography.[166] However, the defense argued that his autism impaired his ability to understand why his behavior was wrong, citing Huseth's compromised ability to ***166** read the facial expressions and emotional states of the children and recognize that "*all* children depicted in child pornography are being hurt."[167] The Court ultimately found that Huseth's autism and associated cognitive deficits significantly impaired his ability to "appreciate the wrongfulness" of his behavior[168] and granted his requested sentence of probation with treatment.[169]

In *United States v. Williams*, the United States Court of Appeals for the Seventh Circuit held that the lower court had erred by failing to consider the defendant's autism as a mitigating factor.[170] Williams had served as the getaway driver in a series of armed bank robberies that his brother had organized.[171] Williams was identified as borderline intellectually disabled and had been diagnosed with "autistic disorders and other pervasive developmental disorders."[172] A jury convicted Williams of conspiracy, two counts of bank robbery by force or violence, and two counts of using and carrying a firearm in relation to a crime of violence.[173] Once he was convicted, the district court did not consider Williams's diagnoses during sentencing, resulting in a sentence of 46 years.[174] Williams appealed his conviction and sentence, and the appellate court affirmed his conviction but ruled that the district court must reconsider Williams's sentence, bearing in mind his mental state and susceptibility to manipulation.[175]

On remand, the district court considered the severity of Williams's autism and recognized that he was institutionalized as a teenager and had lived with his mother for most of his life.[176] Williams's sentence was reduced to 37 years of incarceration, which was 9 years less than his original sentence.[177] The Court could not reduce his sentence any further because the statutory mandatory minimum sentence for Williams's two counts of carrying and using a firearm during a crime of violence was 32 years,[178] and he did not qualify for the exceptions that allow for the imposition of a sentence below the statutory minimum.[179] These 32 years had to be served ***167** consecutively to his sentence for the other counts, and the advisory guideline range for those counts was 11.25 years to 14 years.[180] After considering Williams's autism, the district court reduced this sentence to five years of imprisonment (from the 14-year sentence he received at his initial trial) on those counts.[181]

More recently, in 2019, a 30-year-old man with autism, Jonathan Knott, was charged with possession of child pornography.[182] After being found competent to stand trial, Knott entered into a plea agreement under which the government agreed to seek a sentence at the bottom of the guidelines range.[183] On the basis of his autism, Knott then moved for a downward variance from the recommended sentence of 27 months.[184] The District Court Judge, Myron H. Thompson, granted this motion, referencing Knott's "diminished moral culpability," and sentenced Knott to 27 months of home detention as one of the conditions of seven years of supervised release.[185]

Because Knott did not display obvious language or intellectual impairments, his autism was described as "not always readily apparent."[186] Prior to his trial, Knott was evaluated by two psychologists who agreed that Knott experienced severe deficits in social and adaptive skills.[187] For instance, he scored in the bottom three percent of test takers on a measure of adaptive functioning (i.e., daily living, communication, and socialization skills that are required for success in day-to-day life).[188] Specifically, in the areas of "receptive communication" and "interpersonal relationships," Knott reportedly functioned at about the level of a three-year-old child.[189] Knott also reportedly functioned at about the level of a four-year-old in terms of his "coping skills" and at about the level of a five-year-old in "expressive communication."[190] His parents reported that Knott had experienced problems with socializing, problem-solving, and reading facial expressions since he was a child.[191] This case emphasizes the importance of thorough evaluations and testing in cases where evidence of autism is raised, particularly when a defendant's symptoms are more ***168** nuanced and covert. Had Knott's autism not been considered in determining his sentence, he may have received an unjust punishment for a crime of which he was not fully morally culpable.

### *B. Dismissals of Autism Evidence in Sentencing Decisions*

Despite the examples above, there are many cases in which evidence of autism did not result in a reduced sentence. In *United States v. Zuk*, federal prosecutors indicted a college student on seven counts for "transmitting, receiving, and possessing child pornography" and, while awaiting trial, received a diagnosis of "mild" autism spectrum disorder (ASD).[192] He ultimately pleaded guilty to one count of possessing child pornography as part of a plea deal.[193] Though the Sentencing Guidelines' recommendation for Zuk's relevant conduct considerably exceeded 240 months, a 240-month term was the maximum sentence for possession.[194]

However, Zuk's recently diagnosed autism became the "primary driver" in the federal district court's determination of his sentence: 26 months (time served) and a life term of supervised release.[195] He was also mandated to complete a residential treatment program followed by a 24-month community confinement.[196] The government filed an appeal seeking to have the sentence overturned on the basis that it was too lenient and did not follow the Federal Sentencing Guidelines.[197] The United States Court of Appeals for the Fourth Circuit agreed with the government's position, acknowledging that Zak was "highly functioning" compared to others with autism and that he was not diagnosed until after his arrest.[198]

The Fourth Circuit recognized that it was appropriate for the district court to consider Zuk's autism spectrum disorder as part of the "history and characteristics of the defendant,"[199] but they did not agree that a time-served sentence was reasonable, particularly because Zuk's behavior "was so egregious."[200] Moreover, the Court acknowledged that none of the defense's expert witnesses testified that Zuk's autism *caused* his criminal behavior, nor did the experts argue that Zuk was unable ***169** to appreciate the criminality of his behavior or control his behavior.[201] Thus, the Fourth Circuit vacated and remanded Zuk's case for resentencing by the lower court, and his sentence was amended to 71 months in prison and lifetime supervised release.[202]

The relationship between each individual's ASD symptoms and their alleged crime should be considered carefully, and an autism diagnosis should neither be disregarded nor given undue influence in a criminal case.[203] In *United States v. Morais*, the defendant pled guilty to two counts of receiving child pornography and received eight years in prison along with a lifetime of supervised release.[204] A neuropsychologist testified that Morais was very intelligent but socially impaired.[205] He asserted that Morais suffered from "mind blindness" (i.e., deficits in theory of mind), which made it difficult for him to "perceive, predict, and react appropriately to another person's thoughts, emotions, et cetera, to be able to put yourself in another person's shoes, essentially."[206] He also mentioned that people with autism tend to collect things (a type of restricted, repetitive behavior), and this related to Morais's collection of 8,200 images of nude children on his computer.[207]

However, the district court decided that the defense was unable to demonstrate a clear link between Morais's autism and the crime.[208] While Morais had tendencies to collect items, his autism did not "necessarily dictate the content of" his collection.[209] Morais appealed his sentence, but the United States Court of Appeals for the Eighth Circuit agreed with the lower court's decision to not consider autism as a mitigating factor and affirmed the sentence.[210] Similarly, in *Director of Public Prosecutions v. HPW*, authorities accused a man with autism of sexually molesting his 11-year-old daughter, and the appellate court struck down the argument that the defendant had "misread" his daughter's sexual cues because of his autism.[211]

### *170 IV. Addressing Inconsistencies

The cases provided throughout this brief article highlight the tremendous variation with which defendants' autism is considered throughout criminal proceedings and sentencing decisions. This is partially due to the wide variation in the type and severity of symptoms that people with autism experience. Thus, courts can analyze the "severity" of an individual's autism and decide that leniency is not warranted. For instance, in *United States v. Lange*, the defendant pled guilty to distributing child pornography and requested a downward departure on the basis of diminished capacity due to his ""Asperger's-like disorder" (which would now fall under the umbrella of ASD).[212] Lange did not suggest that he was unable to appreciate the wrongfulness of his behavior but, like Morais, based his argument on the fact that he was unable to control his compulsion to collect child pornography.[213]

The district court denied his request, and Lange appealed this decision, claiming that his sentence of 55 months incarceration was unreasonable.[214] However, testing revealed that neither Lange's executive functioning nor his ability to control his behavior was impaired.[215] The United States Court of Appeals for the Seventh Circuit agreed with the lower court that Lange's disorder was not severe enough to result in cognitive or volitional impairment or warrant a reduced sentence.[216] The success of requests for downward departure on the basis of autism is typically dependent on the severity of the defendant's impairment.

To investigate how autistic people's vulnerability is considered throughout criminal proceedings, a recent study from researchers in the United Kingdom surveyed defense lawyers from 12 nations and presented data on 93 cases involving autistic defendants.[217] Slavny-Cross and colleagues found that 75% of defendants with autism "were not given reasonable adjustments during the process ... despite their known vulnerability."[218] However, in cases where a defendant was convicted, 60% of judges viewed the defendant's autism as a mitigating factor and largely granted suspended or reduced sentences.[219] Of course, in order for courts to consider evidence of a defendant's autism during criminal proceedings, it must first be made known that the defendant has autism. Slavny-Cross and colleagues identified two ***171** possible barriers to identifying defendants with autism: (1) some defendants may not disclose their diagnosis during their interaction with law enforcement, and (2) defendants with autism may be undiagnosed and thus only identified by legal professionals with enough experience to recognize their social and communication deficits and pursue a formal assessment and diagnosis.[220]

In their survey of defense lawyers, Slavny-Cross and colleagues found that 29% of defendants with autism were diagnosed during criminal proceedings, and 10% were diagnosed after proceedings.[221] Results from this study highlight the crucial need for law enforcement and legal professionals to receive "autism awareness training" to learn how to identify autistic traits and ensure proper consideration of these traits throughout proceedings.[222] The researchers also emphasized that many defendants who disclose their diagnoses still fail to receive reasonable adjustments.[223]

Recall *England & Wales v. Matthew*, in which the defendant was diagnosed with ""severe ASD" after his lawyer noticed indicators of autism and recruited experts to assess him.[224] The COVID-19 pandemic and certain "social disadvantage barriers" were accredited with Matthew's autism going undiagnosed until after his arrest.[225] The majority of defendants who are diagnosed during criminal proceedings probably have more "mild" impairments due to autism, hence them going undiagnosed until this point. However, Matthew's case proves that even "severe" autism can go undiagnosed into adulthood in situations where defendants lack the resources or familial support to obtain an earlier diagnosis. This further highlights the importance of legal professionals learning to identify indicators of autism among defendants and getting them evaluated. Matthew's case also elucidates the importance of taking post-arrest diagnoses seriously, as it is possible for individuals with ""severe" autism to remain undiagnosed up to the time of their arrest.

### V. Admissibility of Expert Testimony on ASD

While trial judges are tasked with ruling upon the admissibility of evidence,[226] it is the position of the author that judges should not have the ability to dismiss expert testimony regarding the impact of a defendant's autism. In *State v. Delorenzo* ***172** (2022), Alexander Delorenzo appealed his 2021 sentence of five to fifteen years imprisonment after being convicted of possessing and distributing child pornography.[227] In his appeal, Delorenzo claimed the lower court erred in a variety of ways, the first of which being its decision to prevent Delorenzo's expert from testifying at his trial regarding Delorenzo's autism and obsessive-compulsive disorder (OCD) diagnoses.[228] He argued that the testimony would have provided the jury with context regarding his character traits, mental state, credibility, and subjective understanding of what he was doing.[229] The Supreme Court of Appeals of West Virginia rejected Delorenzo's argument on the grounds that his proposed testimony failed to establish a connection between his diagnoses and the mens rea of the crime, and the Court affirmed his sentence.[230]

Chief Justice Hutchison and Justice Wooton dissented; Justice Wooton stated that he primarily took issue with "the majority's failure to recognize the obvious: that the circuit court's refusal to allow the petitioner's expert witness ... to testify as to his Asperger's Syndrome Disorder ("ASD") gutted the petitioner's ability to advance his sole defense, lack of intent, thereby violating his constitutional right to a fair trial."[231] Wooton noted that the circuit court relied on the absence of a "West Virginia precedent governing admission of expert testimony as to ASD ... either to negate a defendant's mens rea or to explain the affect and behaviors of an individual who has the condition."[232] Thus, when courts lack clear guidance on the admissibility of expert testimony on a defendant's autism, they may dismiss this testimony as irrelevant and miss the opportunity for education on the nuanced ways that the defendant's autism contributed to their criminal behavior and accompanying level of culpability.

In Delorenzo's case, the circuit court failed to consider previous cases in which other jurisdictions were presented with the issue of admissibility of expert testimony concerning a defendant's ASD, disregarding them as "unpersuasive and not applicable to the present case."[233] In his dissent, Justice Wooton argued that these cases are actually "persuasive and highly relevant" to the Delorenzo case.[234] For instance, consider *State v. Burr* (2007), which is referenced above in the present ***173** article.[235] In *Burr*, the trial court chose to exclude expert testimony on ASD, claiming that it did not establish diminished capacity, despite the defense counsel's explanation that they were not intending to establish diminished capacity, but rather to demonstrate that the defendant's "ability to make certain social judgments [was] impaired."[236] On appeal, the Superior Court of New Jersey reversed, finding that it would have been "a more fair and complete adversarial process if, in evaluating the

evidence and the inferences urged by the State, jurors were aware that defendant's mental disability prevent[ed] him from viewing the world as others do in terms of acceptable social interactions."[237] Mentioning that the New Jersey Evidence Rules "broadly admit 'all' relevant evidence, unless the evidence is otherwise excluded," the appellate court concluded that "mental defect evidence is relevant when asserted to prove or disprove an element of a crime or to advance a defense."[238]

Similarly, in *State v. Boyd* (2004), the trial court excluded expert testimony on ASD because it did not address the defendant's diminished capacity.[239] As was the case in *State v. Delorenzo*,[240] the defense counsel argued, in vain, that Boyd's defense was not based on diminished capacity, and the expert testimony would have described the limitations of Boyd's abilities, explained his unusual interests, and shown that he was particularly susceptible to being framed.[241] On appeal, the Missouri Court of Appeals found that the lower court erred by excluding the expert evidence, reversed and remanded for a new trial, and noted that "[t]he denial of the opportunity to present relevant and competent evidence negating an essential element of the state's case may, in some cases, constitute a denial of due process."[242] As mentioned in the dissenting judges' statement following the decision in *State v. Delorenzo*, the majority should have considered the precedents outlined in cases like *State v. Burr* and *State v. Boyd*.[243] They contended that refusing to let Delorenzo's expert witness testify at his trial violated his "right to present his own witnesses to establish a defense ... a fundamental element of due process of law."[244]

***174** Finally, Justice Wooton and Chief Justice Hutchison took issue with the majority's unsubstantiated claim that it is the trial court's responsibility to oversee the examination of each party's witnesses, arguing that this claim is "wholly divorced from the realities of trial practice."[245] The majority contended that decisions concerning "what witnesses to call, how best to elicit information from them, and/or how best to discredit their testimony" are matters for attorneys rather than a duty of the trial judge, whose obligation is "to rule on motions, objections, and issues of law, and - in limited circumstances - to pose clarifying questions"[246] The dissenting justices expressed concern that the majority's decision in this case could prompt more "judicial interference in the presentation of evidence," overstepping a boundary that has been firmly established by the Supreme Court of Appeals of West Virginia:

> The trial judge in a criminal trial must consistently be aware that he occupies a unique position in the minds of the jurors and is capable, because of his position, of unduly influencing jurors in the discharge of their duty as triers of the facts. This Court has consistently required trial judges not to intimate an opinion on any fact in issue in any manner. In criminal cases, we have frequently held that conduct of the trial judge which indicates his opinion on any material matter will result in a guilty verdict being set aside and a new trial awarded.[247]

### *A. Current Practices for Determining Admissibility of Expert Testimony on ASD*

Currently, most states use either the Frye or Daubert standards to determine whether evidence is admissible in court.[248] Those employing the Daubert standard assess expert evidence on the basis of its validity, reliability, methodological dependability, and relevancy, as well as whether the evidence has been peer reviewed, tested, and is typically accepted by the relevant intellectual community.[249] The Frye standard offers a broadened approach to determining the admissibility of expert evidence.[250] This standard states that an expert's opinion is admissible if the "scientific technique on which the opinion is based is 'generally accepted' as reliable in the relevant scientific community."[251]

***175** The Federal Rules of Evidence employ a version of the Daubert standard.[252]The most recent amendment to Rule 702 (Testimony by Expert Witnesses) took effect on December 1, 2023, with the current version of the rule stating that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> 1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> 2) the testimony is based on sufficient facts or data;

3) the testimony is the product of reliable principles and methods; and

4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[253]

This recent amendment made minor changes to the language of Rule 702 that intend to clarify and emphasize the judge's role as a gatekeeper for expert testimony.[254] The new language raises the bar for admissibility of expert testimony, now stating that the proponent of expert testimony must prove that the expert's methods are "more likely than not" reliable.[255] It also requires a stronger connection to be established between experts' opinions and their methods, a matter that courts previously addressed during cross-examination.[256] The new rule, however, emphasizes the judge's role in determining whether an opinion is "more likely than not" supported by an expert's methodology.[257] While these clarifications aim to improve the quality of the expert testimony that is admitted, they risk making it even more difficult for autistic defendants to present evidence of their ASD as part of their defense.

Despite the recently increased stringency of Rule 702, Rule 706 offers another avenue for defendants to get expert testimony admitted.[258]Rule 706(a) (Appointment Process) stipulates the following:

> ***176** On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act.[259]

For judges, there are no obvious barriers to the court appointment of experts and very few disadvantages to doing so.[260]

**VI. Proposed Solution**

A review of the cases presented throughout this article suggests that many judges do not seem to understand autism well enough to apply the existing law in a matter that affords proper consideration to the ways that autism can contribute to a defendant's culpability and deserved punishment. Without expert testimony, judges and juries risk making unfair and excessively harsh decisions regarding autistic defendants that do not reflect their unique circumstances. Thus, future legislation should explicitly require courts to appoint (or at least allow) an expert in cases involving defendants with autism. An expert can provide insight on a defendant's individual experience of autism and whether it: (1) affects their ability to form the requisite criminal intent to be convicted of their crime and/or (2) is mitigating and warrants a lower sentence.[261] Once provided with this insight, courts would still have the power to determine whether a defendant's autism was directly related to their criminal behavior and whether their symptoms are "severe" enough to warrant a successful defense or a lighter sentence.[262]

One possible solution to address the inconsistency with which expert evidence of autism is permitted and adequately considered would be to make another adjustment to the Federal Rules of Evidence. These rules could specify that courts are required to utilize an expert in cases where a defendant has been diagnosed with autism, whether the diagnosis was given before the alleged offense(s) or at some point during criminal proceedings. Either party would still be able to submit their own expert to be considered under Rule 702, but if their expert's testimony was inadmissible for some reason, autistic defendants should not be deprived of their right to utilize expert testimony in their defense.[263] Thus, Rule 706 could be amended to include a statement such as, "In cases where the defense can provide ***177** evidence of a defendant's ASD, the court is required to appoint, or at least allow, any appropriate expert who consents to act and is qualified to testify on the defendant's diagnosis and symptoms."

Requiring courts to appoint expert witnesses in cases where one is not appointed by either party would solve the problem of defendants with limited financial resources being unable to afford their own expert witnesses. The utilization of expert witnesses ensures that each defendant's autism is considered on an individual basis, taking into account their specific

symptoms and how they contributed (or did not contribute) to their criminal behavior.[264] The various cases presented throughout the present article highlight the assortment of ways in which symptoms of autism can influence defendants' presentation in court, interpersonal interactions, ability to control their behavior, and/or capacity to appreciate the wrongfulness of their acts.

While the Federal Rules of Evidence only apply in federal court, many states base their rules of evidence on the federal system. Thus, amending the Federal Rules of Evidence would hopefully inspire individual states to integrate more explicit language into their statutes to ensure experts for defendants with autism. In theory, this type of amendment could be applied to a variety of other mental illnesses and disorders as well, though this article has focused on its application to autism specifically.

## VII. Potential Counterarguments

Anticipated counterarguments for this proposal would likely mimic those offered against other laws that allow for leniency in cases involving defendants with mental illness. For instance, some may have concerns about whether such laws create the opportunity for defendants to feign as mentally ill in an attempt to garner leniency from the court. In cases where a defendant claims to have autism, the hypothetical amendment to Rule 706 would require evidence of their ASD diagnosis before the court is required to grant an expert witness. If a defendant has no previous diagnosis (and no legal professionals noticed any indicators of autism that prompted an official evaluation at some point during criminal proceedings), courts would not be required to admit or provide expert testimony.

Another potential counterargument to the proposed amendment might be that the appointment of expert witnesses to more cases involving autistic defendants would be too expensive and time-consuming. While the proposed solution may be expensive and lead to some delays, the research and cases presented throughout this article demonstrate that the proper consideration of autism evidence is integral in yielding fair and informed convictions and sentencing outcomes for these ***178** defendants. A more definite solution would indeed be easier to apply, more affordable, and create further uniformity (e.g., listing autism as a permissible downward departure at the federal level or codifying autism as a mitigating factor at the state level). However, autism exists on a spectrum, so categorical treatment of the diagnosis would be unsuitable in the context of legal decision-making.

Autism is known as a spectrum disorder because of the wide variation in the type and severity of symptoms that people experience.[265] It is important to highlight that many individuals with autism are highly intelligent and capable of making rational, smart decisions.[266] So, it would be harmful to perpetuate the stereotype that all people with autism are inherently less capable than those without autism. As previously mentioned, the APA provides severity specifiers in the DSM-5-TR for clinicians to indicate the amount of support each individual requires.[267] However, they specifically state, “The descriptive severity categories should not be used to determine eligibility for and provision of services; these can only be developed at an individual level and through discussion of personal priorities and targets.”[268]

This rationale should also extend to the consideration of autism in the legal system, as it would be inappropriate to assume that all individuals with autism experience a similar level of impairment. Even if autism were to be acknowledged more explicitly in the law (e.g., as a permissible downward departure or mitigating factor), utilization of the specifiers provided in the DSM-5-TR should not be used to determine which individuals experience impairment “severe” enough to warrant leniency. Each defendant with autism should be individually assessed by an expert to determine whether they experience a level of impairment that would significantly affect their ability to form criminal intent or warrant a downward departure or variance in sentencing.

A final counterargument anticipated for this proposal is that it is a way for people with autism to blame their behavior on their diagnosis and avoid punishment. It is important to emphasize that the proposed amendment to the Federal Rules of Evidence would not guarantee that all defendants with autism receive leniency from the court. Simply providing evidence of one's autism would not be enough for defendants to beat their charges, reduce their sentences, or negotiate better plea deals. Ensuring the utilization of expert witnesses in cases involving autistic defendants ***179** would simply guarantee an expert on the matter the opportunity to explain to judges and juries the nuances of the disorder and how it affects that particular defendant. For instance, *United States v. Zuk* and *United States v. Morais* mentioned above provide examples of autism diagnoses having no mitigating influence on sentencing where a clear link cannot be established between a defendant's autism and their crime.[269] In both the *Zuk* and *Morais* cases, the severity of the defendants' symptoms was carefully considered in determining whether reduced sentences were warranted.[270]

## VIII. Conclusion

There has been increasing pressure for mental health professionals to testify on how a defendant's mental illness or disorder affects their culpability.[271] Expert witness testimony is especially imperative to help courts handle these unique cases involving criminal defendants with autism. In any case where a defendant's autism is a relevant issue, legislation should ensure the presence of an expert witness to help judges and juries understand the defendant's symptoms and whether they may have reduced their culpability.[272] Without this explicit legislation, courts will continue to handle these cases with minimal guidance despite the plethora of evidence demonstrating how differently individuals with autism communicate, process information, make decisions, and interpret social cues.[273] This lack of guidance will surely result in more offenders with autism receiving unwarranted punishments while being deprived of the individualized treatment required to develop appropriate social behaviors and prevent recidivism.

While it would be unrealistic to first suggest that major changes be made to each state's laws on expert testimony, a potential place to start would be to amend Rule 706 of the Federal Rules of Evidence in hopes that individual states would follow suit.[274] Rule 706 should be amended to include a statement that courts are required to appoint, or at least allow, expert witnesses in cases involving diagnosed autistic defendants. Of course, this proposal could also apply to other psychiatric diagnoses, though the present paper intended to establish its appropriate usage for ASD. Ensuring that expert testimony is provided and adequately considered in these cases would help courts to appreciate the nuances of each individual's disability, ***180** better estimate their moral blameworthiness, and assign more informed and proportionate punishments.[275]

## Footnotes

a1 Jenna Hayes is part of the Department of Psychology at the University of Alabama, Tuscaloosa. This article was written on April 1, 2024 and revised on February 11, 2025. https://orcid.org/0000-0003-3178-0399. Jenna has no conflicts of interest to disclose. Please address all correspondence concerning this manuscript to Jenna at jkhayes2@crimson.ua.edu.

1 Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 56-57 (5th ed. 2022) [hereinafter APA, DSM-5-TR].

2 *Data & Statistics on Autism Spectrum Disorder*, Ctrs. for Disease Control & Prevention (May 16, 2024), https://www.cdc.gov/autism/data-research/index.html; Jennifer Cromer, *Autism: Fastest-Growing Developmental Disability*, U.S. Army (April 5, 2018), https://www.army.mil/article/203386/autism_fastest_growing_developmental_disability.

3 *See* J. Collins et al., *A Systematic Review of Autistic People and the Criminal Justice System: An Update of King and Murphy (2014)*, 53 J. Autism Dev. Disorders 1351, 1351 (2023).

4 *See* Ami Tint et al., *Correlates of Police Involvement Among Adolescents and Adults with Autism Spectrum Disorder*, 47 J. Autism Dev. Disorders 2639, 2640 (2017); *see generally* Collins et al., *supra* note 3; Dennis Debbaudt, LinkedIn (Oct. 3, 2019), https://www.linkedin.com/pulse/beyond-guilt-innocence-asd-dilemmas-criminal-justice-system-debbaudt/; Rachel L. Fazio et al., *An Estimate of the Prevalence of Autism-Spectrum Disorders in an Incarcerated Population*, 4 Open Access J. Forensic Psych. 69, 69 (2012); Charlotte Blackmore et al., *Adults with Autism Spectrum Disorder and the Criminal Justice System: An Investigation of Prevalence of Contact with the Criminal Justice System, Risk Factors and Sex Differences in a Specialist Assessment Service*, 26 Autism 2098, 2098 (2022).

5 Verity Chester et al., *The Prevalence of Autism in the Criminal Justice System: A Systematic Review*, BJPsych Open (June 20, 2022), https://www.cambridge.org/core/journals/bjpsych-open/article/prevalence-of-autism-in-the-criminal-justice-system-a-systematic-review/E7650AD83B0CA0C0C936A966D081F943.

F

**U.S. Department of Justice**
Information Technology & Data Division
Office of Research & Evaluation

**BRIEF TECHNICAL EVALUATION REPORT** **August 2024**

# The Resolve Trauma Treatment Program: A Retrospective Evaluation of the Effects of Program Participation on Behavioral Outcomes. 2014—2019.

Erik Faust, Kyle Shea, Scott Camp, Tamara Klein

*Key Findings*

- In this Retrospective analysis, FBOP evaluates a trauma-informed intervention, the Resolve Treatment Program (RTP). A prospective analysis will be forthcoming which will afford more in-depth and rigorous analysis of the program.
- The intent of this program is to reduce trauma-related psychology disorders. The goal is to improve functioning so that there are better outcomes both during and following FBOP custody.
- Overall, the results from the fixed effects analysis showed support for the impact of the RTP on readily quantifiable post-program behaviors of those who participated in treatment.

## INTRODUCTION

The prevalence of trauma experiences in the general population is a known and growing issue. The experience of trauma among the custodial population is even greater. Exposure to trauma is often associated with several mental health disorders and substance abuse issues. Further, individuals in custody often lack the necessary coping mechanisms to deal with these events in a healthy manner.

The Federal Bureau of Prisons (FBOP) has approached the delivery of trauma informed treatment through the development of the Resolve Treatment Program (RTP). This research brief provides an overview of our initial attempt at determining the degree to which this intervention impacts the functioning of individuals incarcerated in the FBOP who have completed this intervention.

## THE RESOLVE PROGRAM

The RTP was designed to treat persons suffering from trauma-related disorders. Broadly, the RTP is a group-based treatment protocol that includes one psychoeducational and three treatment groups. The three treatment groups are Seeking Safety, Dialectical Behavior Therapy (DBT), and Cognitive Processing Therapy (CPT). All phases are designed to treat symptoms of posttraumatic stress disorder (PTSD), other trauma-related disorders, and substance abuse. Those wishing to continue treatment may enter a maintenance phase (phase 3) after the completion of the main treatment groups.

The main goal of the RTP is to decrease the incidence of trauma-related psychological disorders and improve the functioning of persons who are affected by such disorders. Accordingly, by increasing their functioning, it is anticipated that there will be a subsequent increase in the efficacy of other programming, such as the Residential Drug Abuse Program. Further, we also anticipated that the treatment of any trauma-related disorders will reduce institutional misconduct and placements in segregated housing, lower the number of crisis-related contacts, and reduce recidivism upon release.

## DATA

Data for the RTP study was collected from the Bureau Electronic Medical Records – Psychology Data System (BEMR-PDS) and SENTRY inmate management system. In addition to housing all clinical psychology data, BEMR-PDS also tracks RTP program participation. All participation data was collected for the 13 female Resolve program sites from April 2014 through December 2019. This dataset resulted in a sample of 897 female adults in custody who completed the program during the reference period.

## METHODS

We were confronted with several challenges when attempting to evaluate the RTP. First, although the program is primarily designed to treat those suffering from trauma, we did not have access to a formalized measure of PTSD or any other symptoms associated with trauma exposure, such as anxiety or depression. As such, we were unable to create a comparison group of those with trauma issues who did not participate in the program. Second, the multi-phase aspect of the RTP created a situation wherein some incarcerated individuals would complete the program after the Seeking Safety phase, while others would go on to complete RTP after taking Cognitive Processing Therapy (CPT)CPT or Dialectical Behavior Therapy (DBT). We had no mechanism to predict who would go on to these latter phases of treatment (e.g., DBT, CPT or both) after completing Seeking Safety and it was therefore impossible to create a comparison group of individuals appropriate for further treatment, but who did not move forward with the process.

Given the above difficulties and the absence of the ability to conduct a randomized controlled trial due to ethical limitations inherent in restricting program participation to any individual in custody, we sought to design a study that would allow us to draw some conclusions about the program's efficacy, even in the absence of the ability to infer causation. As such, we utilized a fixed effects regression approach. This approach allowed us to minimize bias in the selection process as each study participant served as their own comparison.

## MEASURES & ANALYTICAL APPROACH

To understand the possible effects of the RTP on the behavior of the participants, the following markers were examined:

- Incident reports (Misconduct)
- Duration of time (days) in Special Housing Unit (SHU) for any reason
- Major Psychology Services Events (MPSE) defined as the following:
    - Crisis Interventions
    - Disruptive Behavior Interventions
    - Psychology Alerts
    - Behavioral Management Plans
    - Suicide Risk assessments

We chose 365 days to observe behavior of the RTP samples both before entry into the RTP and post program completion. To be included in the analyses, each Resolve participant had to meet the 365 days of observation both before and after completing the program. For example, if participants either had too few days in custody prior to entering the RTP, or left custody within 365 of RTP completion, they were excluded from the sample.

The first set of models utilized conditional logistic regression to determine if there was a change in the probability of any of the outcome markers during the post-treatment risk period. In this approach, we excluded those who had no change in observed behavior across the observation periods.

The second round of modeling used conditional Poisson models to determine the extent to which change occurred in the number of events in the outcome measures from pre- to post- program completion. Participants in this model were excluded if they had zero observations in both pre-and post-periods.

## RESULTS

Overall, the results from the fixed effects analysis showed support for the impact of the RTP on post-program behaviors of those who completed treatment.

Table 1 shows the total number of cases in the sample, broken down by valid and invalid cases for both the logistic regression probability (PROB) and Poisson

regression count (CNT) models. As shown in the table, both modeling approaches resulted in many participants being excluded from the analysis due to a failure to meet inclusion criteria.

**Table 1: Valid Study Cases per Model Type**

| | Misconduct | | SHU | | MPSE | |
|---|---|---|---|---|---|---|
| | CNT | PROB | CNT | PROB | CNT | PROB |
| **Total** | 897 | 897 | 897 | 897 | 897 | 897 |
| **Valid** | 409 | 268 | 296 | 209 | 88 | 67 |
| **% Used** | 45.6 | 29.9 | 33.0 | 23.3 | 9.8 | 7.5 |
| **Invalid** | 488 | 629 | 601 | 688 | 809 | 830 |

The results from both the count and probability models are presented in Table 2. The count model is presented first followed by the conditional probability models for the three markers (misconduct, special housing unit duration, and major psychological services events).

### Misconduct

The estimated coefficient for the count model (-0.11) represents the change in the average number of misconduct events comparing pre- to post-program. Expressing this in terms of percent change, we found a 10.4% decrease on average from pre- to post-program misconduct events. However, this was not statistically significant, and thus we cannot conclude there was a difference between risk periods.

The same held true for the probability model: Although the direction of the estimated coefficient (-0.13) was in the expected direction (decrease), it was not statistically significant (p>.05).

### Special Housing Unit (SHU)

The estimated coefficient from the count model was not statistically significant (1.29, p >.05). However, the estimated coefficient of the conditional logistic model was significant (-0.34, p<.05), indicating that the odds of being placed in SHU decreased 28.7% from the pre-program period to the post-program period.

### Major Psychology Service Events (MPSE)

The estimated coefficient for the number of MPSE (-0.35) was in the expected direction (decrease) but was not statistically significant[i]. As with the conditional logistic model for SHU, the same analysis for MPSE showed a statistically significant decrease in the odds of an MPSE event from the pre-program to the post-program period (-0.78, p<.05). Specially, there was a 54.3% reduction in the odds of an MPSE event in the post-program period compared to the pre-program period.

**Table 2: Fixed Effects Regression for Outcomes**

| | Misconduct | | SHU | | MPSE | |
|---|---|---|---|---|---|---|
| | CNT | PROB | CNT | PROB | CNT | PROB |
| ***Intercept*** | | | | | | |
| **Estimate** | -0.11 | -0.13 | 1.29 | -0.34 | -0.35 | -0.78 |
| **S.E.** | 0.08 | 0.12 | 1.93 | 0.14 | 0.17 | 0.26 |
| **P** | 0.17 | 0.27 | 0.05 | 0.01* | 0.05 | 0.01* |
| | | | | | | |
| ***Time*** | | | | | | |
| **Estimate** | | | -0.69 | | | |
| **S.E.** | | | 0.30 | | | |
| **P** | | | 0.02* | | | |

## SUMMARY & CONCLUSION

The results of this analysis are promising with regard to understanding the impact of the RTP on the behavior of individuals who have completed trauma-informed programming; two of the three outcome markers - Duration of time in SHU and MPSE events - showed statistically significant decreases from the pre-program observation period to the post-program observation period, depending on the modeling approach we utilized. A few limitations, however, should be mentioned.

The most basic limitation was our methodological approach. While necessitated by the data available, a fixed effects regression approach does not have the methodological rigor associated with a higher quality program evaluation. As such, the absence of a comparison group limits the ability to draw conclusions about the impact of the RTP on those who participate versus those who don't.

The second, and perhaps more important limitation is simply the outcome measures we had available with which to evaluate the effectiveness of the RTP. While some significant effects in the models were found, it is

not entirely clear that these measures are the most appropriate with which to understand the effectiveness of a trauma treatment program. Further, a large proportion of cases had to be excluded in both modeling approaches due to a lack of change from the pre- to post-observation period. Therefore, any type of change could not be estimated from a treatment effect because there was simply no change to measure.

To conclude, while this analysis suggests a positive impact on the behavioral outcomes measured, it is not enough to show a causal impact of this trauma-informed intervention and neither does it show the effect of this programming compared to a group of similarly situated individuals who did not participate in the RTP.

Finally, the design of the current study also necessitated that we look only at those who completed at least the first stage of the RTP. By only measuring such persons and not including those who also may have benefitted from exposure to treatment, we are unable to say anything about the effect of any time spent in treatment on subsequent behavior.

In consideration of these limitations, we hope to learn more about the impact of the RTP on measurable outcomes with a prospective evaluation in process. We are currently collecting data on several symptom measures associated with trauma. These assessments will provide a baseline understanding of symptomology and allow us to observe any possible changes with a group of treatment participants compared with a group who are not.

[i] While the p value of the MPSE count model is over the expected .05 significance level, it should be noted that this is a rather conservative estimate of statistical significance and one that applies a two tailed test to what should theoretically be a single tailed test, as we are assessing whether a program worked or did not. Notwithstanding, there is much debate about this methodological approach in the scientific literature which is beyond the scope of the current project. We are therefore staying with convention, referring to this outcome as not statistically significant.